UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

RAMIN ZAMANI-ZADEH,                                                     No. 20-11939-t7

      Debtor.

TAEKI MARTIN,

      Plaintiff,

v.                                                                                     Adv. No. 20-1077-t

RAMIN ZAMANI-ZADEH,

      Defendant.

## **OPINION**

Before the Court is whether some or all of Defendant's debt to Plaintiff[1] is nondischargeable under § 523(a)(2)(A).[2] The Court tried the merits of the proceeding on October 25, 2022, and March 2, 2023. The Court now rules that all the debt is nondischargeable.

A.    Facts.[3]

The Court finds:[4]

---

[1] Plaintiff died in 2022. Her interest in this proceeding is now represented by her estate. In this opinion Plaintiff means either Taeki Martin during her lifetime or her estate, depending on the context.
[2] Unless otherwise indicated, all statutory references are to 11 U.S.C.
[3] The Court takes judicial notice of the dockets in this adversary proceeding and the main case. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may sua sponte take judicial notice of its docket and of facts that are part of public records).
[4] Some of the Court's findings are in the discussion portion of the opinion. They are incorporated by this reference.

In 2008, Defendant Ramin Zamani-Zadeh had 12 years of restaurant experience and 8 years of construction experience. He was in an Oregon prison, serving a sentence for bank fraud. While in prison he met Steve Martin, who was serving a sentence for drug dealing. Defendant told Martin he wanted to start a restaurant after he got out. Defendant and Martin discussed a funding source for the venture. Martin told Defendant that Martin's mother, Plaintiff Taeki Martin, might be willing to invest in the business. At some point, Martin suggested to his mother that she mortgage her house in the Seattle, Washington area to raise money and invest the proceeds in Defendant's restaurant venture. The house, which Plaintiff owned free and clear, was her only substantial asset.

When Defendant got out of prison he met with Plaintiff at her house. Martin was still in jail. Defendant and Plaintiff agreed they would go into the restaurant business together. In general terms, Plaintiff agreed to invest one half of the money needed for the restaurant venture and Defendant would supply the other half. Defendant formed Zamani Entertainment LLC, a Washington limited liability company ("Zamani Entertainment"), in March 2008 to own and operate the restaurant. The evidence is unclear whether Plaintiff was to own half of the LLC or just 25%.

Plaintiff mortgaged her house and obtained proceeds of $194,644.18, which she deposited into a newly opened Zamani Entertainment account at US Bank. The only other capital contribution was a loan for $80,000 from the Defendant's parents.

Defendant contacted brokers and looked for a restaurant location in Seattle. Plaintiff and Defendant looked at several Seattle locations and were interested in one, but did not sign a lease. Defendant and Plaintiff then began looking for a location in Portland, Oregon. Eventually they found a building that formerly was operated as the House of Gold restaurant.

Obtaining a liquor license was essential to Defendant's business plan. However, under Oregon law, liquor licenses cannot be issued to businesses owned by convicted felons. Because of that, even though Defendant was a co-owner of Zamani Entertainment, he was never listed as an owner. Instead, Defendant's father was put on the books as an owner. Similarly, Plaintiff wanted her son Martin to be an owner of the restaurant, so he would have a useful occupation after he got out of jail. However, because of his criminal conviction, he was never shown as an owner.

At some point in the spring or early summer of 2008, Martin was released from prison and sent to a halfway house in the Seattle area. Martin slept at the halfway house but was able to go to Portland on the weekends. Contrary to his mother's hopes and wishes, Martin continued to associate with the same, or same type, of people he associated with before he went to prison. Defendant described it as a drug-dealing lifestyle.

In May 2008, Defendant and Martin bought a boat, using $6,104 from the Zamani Entertainment bank account and a loan for $21,099 obtained in Plaintiff's name. There are pictures of Martin, Defendant, and unknown women "partying" in the boat.

By forging Plaintiff's signature on the application, Defendant got an American Express credit card for the business. Using the card, Defendant or Martin bought clothing, expensive dinners, and trips for Martin.

In June 2008, Defendant caused Zamani Entertainment to buy a "limousine" for $75,000. He bought the limousine to take restaurant customers home if they had had too much to drink. In October 2008, Defendant caused Zamani Entertainment to pay an additional $77,396 for limousine repairs and expenses. The expenses were paid with checks made out to cash and a Zamani Entertainment debit card. Martin had access to the debit card.

-3-
Case 20-01077-t    Doc 62    Filed 05/11/23    Entered 05/11/23 11:52:56 Page 3 of 12

Martin had possession of or access to Zamani Entertainment credit cards, and also to credit cards in Plaintiff's name that Defendant had obtained. The credit cards were issued by Bank of America, Washington Mutual, Bank of the West, and American Express. Defendant obtained the cards. It is not clear how much Plaintiff knew about or was involved in opening the credit card accounts, all of which were in her or Zamani Entertainment's name. Martin charged about $30,000 on the Bank of the West card.

Plaintiff never was aware of, or authorized, Martin or Defendant to use her personal or the business credit cards for non-business expenses. Plaintiff thought the American Express card was in Defendant's name and did not know Martin had access to it.

The lease for the former House of Gold building was signed on June 25, 2008. The space was remodeled between June and September 2008. The remodeled premises featured a restaurant downstairs and a nightclub upstairs.

In July 2008 Defendant, through an attorney, drafted an LLC interest purchase agreement (the Purchase Agreement") that obligated Plaintiff to pay $480,000 for 75% of Zamani Entertainment.[5] Defendant convinced Plaintiff to sign the Purchase Agreement. Plaintiff was persuaded that she would be able to make the required payments from her restaurant profits.

The restaurant, named Ibiza, opened in September 2008. While the restaurant was open, it made very little profit, although it was able to generate enough cash to pay its rent, labor, food and beverage costs, and similar expenses. One problem Ibiza had was that Martin would come to the restaurant when he could get away from the halfway house and "drink the profits."

---

[5] An operating agreement for Zamani Entertainment listed Defendant's father as owning 75% of the LLC and Plaintiff as owning the other 25%.

In December 2008, Defendant issued a default letter to Plaintiff stating that her interest in Zamani Entertainment had been forfeited because of her default under the Purchase Agreement.

Plaintiff did not know until much later that Defendant tried to forfeit her interest in Zamani Entertainment. Plaintiff did not recall getting a notice of default, and was only made aware of it after the fact by her lawyer.

Ibiza closed on January 30, 2009. Plaintiff never received any money from the restaurant. The liquor license granted to Ibiza was temporary and was not renewed after it expired in January 2009.

Plaintiff sued Defendant, Zamani Entertainment, and several of their affiliates in Oregon state court in January 2009, bringing claims for violation of Oregon's Abuse of a Vulnerable Person statute (ORS § 124.100 et seq.); conversion; making wrongful corporate/LLC distributions; and to expel Defendant as a member of Zamani Entertainment and affiliated LLCs. Defendant answered the complaint[6] through counsel but failed to appear at the trial on the merits, scheduled for February 22, 2010. Plaintiff examined witnesses and introduced documentary evidence at the unopposed trial. On May 14, 2010, the state court entered a judgment of $1,001,865.51 in favor of Plaintiff and Zamani Entertainment against Defendant and others under Oregon's Abuse of Vulnerable Person statute. The judgment included $233,955.17 in "economic damages," $100,000 in "non-economic" damages, and trebled both.[7] The judgment accrues interest at 9% and remains unpaid.

The judgment including the following:

The Court makes a specific finding that the lease documents executed in favor of Lease Company of America do not bear the genuine signature of Plaintiff Martin,

---

[6] Defendant's answer recites that it is responding to an amended complaint. There is no amended complaint in the record, one of several problems with Plaintiff's request for summary judgment.
[7] *See* ORS § 124.100(2).

but rather represent forgeries by Defendant Ramin Zamani, aka Ramin Zamani-Zadeh.

Defendant filed this no-asset chapter 7 case on October 7, 2020, and was granted a discharge on August 17, 2021. Plaintiff filed this adversary proceeding on December 20, 2020. In her complaint, Plaintiff sought the following relief:

> That upon hearing of this matter, the court deny the discharge of Debtor Zamani as to all of the debt arising from claims asserted by Plaintiff in the state court case styled TAEKI MARTIN, an individual, and ZAMANI ENTERTAINMENT LLC, a Washington Limited Liability Company vs. RAMIN ZAMANI, an individual; ZAMANI ENTERTAINMENT LLC, an Oregon Limited Liability Company; 365 Z PRODUCTION, INC., an Oregon Corporation; IBIZA, INC., an Oregon Corporation; and, 365 AUTO DEALER, INC., a Washington Corporation, case no. 0901-01452;
>
> That, in the alternative, if this Court does not grant discharge on all claims, that it deny discharge for any debt it does included [sic] fall within the purview of 11 U.S.C. § 523(a)(2) and/or 11 U.S.C. § 548. . . .

B.  The Trial Record.

The trial record is somewhat sparse. Plaintiff did not call a witness or introduce documentary evidence in support of her case. Instead, she relied on the complaint, answer, judgment, her 2010 testimony in the state court action, and the cross-examination of Defendant in this proceeding.[8] This evidence, together with Defendant's direct examination testimony, Debtor's trial exhibits, the testimony of Defendant's former Oregon liquor license attorney, and Defendant's admissions in his answer to the complaint, comprise the trial record.

---

[8] On the date scheduled for trial in October 2022, Plaintiff moved to admit the complaint, answer, judgment, and Plaintiff's 2010 trial testimony into evidence. Defendant objected, pointing out that Plaintiff's exhibit list only included the judgment and trial testimony. The argument segued to other matters and the Court never officially ruled on the motion and objection, although the parties proceeded as if all the offered exhibits had been admitted. The Court now rules that the complaint, answer, judgment and 2010 trial testimony (Plaintiff's only) will be admitted. Defendant is right that the complaint and answer were not on Plaintiff's exhibit list. Nevertheless, there is no question about the relevance and authenticity of those documents, which Defendant has had since the beginning of this proceeding and has argued about extensively.

C. The Court Will Not Amend Its Earlier Ruling Denying Summary Judgment.

Before, during, and after trial, Plaintiff asked the Court to reconsider its order denying Plaintiff's motion for summary judgment. The order is interlocutory. *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011) (ordinarily, an order denying a motion for summary judgment is interlocutory and not a final judgment). The Court has discretion to amend, overrule, or withdraw an interlocutory order at any time before the entry of final judgment. *See, e.g., In re Akbari-Shahmirzadi*, 2016 WL 126301, at *2 (Bankr. D.N.M. 2016); and *Raytheon Constructors, Inc. v. ASARCO, Inc.*, 368 F.3d 1214, 1217 (10th Cir. 2003); *see generally* Fed. R. Civ. P. 54(b), made applicable by Fed. R. Bankr. P. 7054 (any order or other decision that adjudicates fewer than all the rights, liabilities, or claims of fewer than all the parties and does not end the action may be revised at any time prior to the entry of final judgment).

The Court has reviewed the order denying Plaintiff's motion for summary judgment and concludes it was properly decided, for the reasons stated in the opinion entered with the order. The issue is moot, however; the Court's ruling on the merits, set out in this opinion, awards the same relief Plaintiff sought in her summary judgment motion.

D. Elements of a § 523(a)(2)(A) Claim.

Section 523(a)(2)(A) prohibits the discharge of a debt "for money . . . to the extent obtained by . . . false pretenses, a false representation, or actual fraud[.]" To prevail in her § 523(a)(2)(A) claim, Plaintiff must prove the requisite facts by a preponderance of evidence. *In re Young*, 91 F.3d 1367, 1373 (10th Cir. 1996).

1. False Pretenses. False pretenses under § 523(a)(2)(A) are "any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor."

*In re Osborne*, 520 B.R. 861, 869 (Bankr. D.N.M. 2014), *quoting In re Sturgeon*, 496 B.R. 215, 223 (10th Cir. BAP 2013). A false pretenses claim presents the issue of "whether, by silence, insinuation, or inference, [the d]ebtor knowingly acted in [a way] as to create a false impression in the mind of [the plaintiff]" about the transaction at issue. *In re Woods*, 616 B.R. 803, 813 (Bankr. N.D. Okla. 2020).

2. <u>False Representation</u>. "False representations are representations knowingly and fraudulently made that give rise to the debt." *Osborne*, 520 B.R. at 868, quoting *In re Sutherland–Minor*, 345 B.R. 348, 354 (Bankr. D. Colo. 2006), *see also In re Lewis*, 271 B.R. 877, 885 (10th Cir. BAP 2002) (same). To prevail on a false representation claim, the Plaintiff must prove: "The debtor made a false representation; the debtor made the representation with the intent to deceive the creditor; the creditor relied on the representation; the creditor's reliance was reasonable; and the debtor's representation caused the creditor to sustain a loss." *Young*, 91 F.3d at 1373.

3. <u>Actual Fraud</u>. The term "actual fraud" in § 523(a)(2)(A) "denotes any fraud that involves moral turpitude or intentional wrong." *Husky Intern. Elecs., Inc. v. Ritz*, 578 U.S. 356, 359 (2016). It can be proven by showing "a scheme to deprive or cheat [Plaintiff] of property or a legal right." *In re Vickery*, 488 B.R. 680, 690 (10th Cir. BAP 2013); *see also* 4 Collier on Bankruptcy ¶ 523.08[1][e] (16th ed.) (actual fraud is "a deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with the design of perpetrating what is known to be a cheat or deception.")

E. <u>Defendant's Conduct Comes Within § 523(a)(2)(A)</u>.

Plaintiff argues that Defendant defrauded her, taking her net worth and leaving nothing but unpaid bills. Defendant counters that Zamani Entertainment was a legitimate business venture; that he invested sweat equity and $80,000 of (his parents') cash, and that the restaurant failed for

reasons beyond his control, including Plaintiff's efforts, through her counsel, to shut it down. Defendant also argues that he went along with Martin's improper purchases and conduct to avoid a confrontation with Plaintiff over Martin.

The Court finds and concludes that Plaintiff's version of events is the accurate one. Defendant is an intelligent man. Had he been honest, he would have refused to buy the limousine or boat. He would never have allowed Martin to be involved in the business, would not have paid for Martin's trips, clothing, or meals, and would not have allowed Martin to "drink the profits." He would have carefully explained to Plaintiff about all credit cards obtained, and would have limited their use to legitimate restaurant expenses. Knowing that Plaintiff had mortgaged her house to raise the investment capital, an honest businessman would have ensured that she had funds available to service the mortgage.

An honest businessman would have found a legitimate way for Ibiza to obtain a liquor license (if possible) before spending any substantial capital. An honest businessman would have told Plaintiff about the liquor license problem and explored alternative restaurant concepts if a license proved unobtainable. He would not falsify corporate documents to hide his ownership of the restaurant, in an effort to defraud the Oregon liquor license authority.

An honest businessman would have had a budget for capital expenses that would have allowed the restaurant to open, fully equipped and staffed, with sufficient capital to operate.

An honest businessman would not forge his partner's signature twice.

When Plaintiff proposed that Martin be part of the restaurant venture, an honest businessman would have objected and pointed out the substantial risks. If Plaintiff insisted, an honest businessman would have declined the endeavor altogether, knowing that Martin should

-9-
Case 20-01077-t    Doc 62    Filed 05/11/23    Entered 05/11/23 11:52:56 Page 9 of 12

never be allowed near a restaurant's cash, checkbook, credit cards, or liquor supply. Honest people don't go into business with unreformed drug dealers.

An honest businessman would never had prepared the Purchase Agreement, nor valued his interest in the start-up at $480,000, nor cajoled Plaintiff into signing it, and would never have attempted to take Plaintiff's share of the restaurant away from her on the pretext of a default under the Purchase Agreement.

Most important of all, had Defendant been an honest businessman he would never have allowed Plaintiff to invest her life savings in his risky start-up venture. Investors in risky start-ups must be able to withstand the loss of their entire investment. Plaintiff was not in that category. Ibiza's failure wiped her out.

The Court finds and concludes that Defendant is not an honest businessman. He is dishonest and scheming. Plaintiff was elderly, unsophisticated in American business dealings, and not proficient in English. She was blind to her son's failings and willing to do anything to help him rehabilitate. In short, Plaintiff was an easy mark. The equity in Plaintiff's house was too tempting for Defendant to ignore. With Martin's help, Defendant introduced himself to Plaintiff and hit upon a scheme to separate her from her net worth. He did not care what happened to Plaintiff after the money was gone.

Knowing the restaurant venture was doomed for the reasons discussed above, Plaintiff stuck with his fraudulent scheme until the money ran out, the temporary liquor license expired, and Plaintiff's lawyer came after him. When things got too hot, Defendant lit a shuck for Tucumcari, New Mexico.

The Court finds and concludes that Defendant acted under false pretenses with respect to, and/or committed actual fraud against, Plaintiff, within the meaning of § 523(a)(2)(A).

F.   Damages.

Once the bankruptcy court determines that a debtor has defrauded a creditor within the meaning of § 523(a)(2)(A), the court must declare nondischargeable all liability "arising from" the fraud. *Cohen v. de la Cruz*, 523 U.S. 213, 215 (1998); *see also In re Bloom*, 2022 WL 2679049, at *6 (10th Cir.) ("[t]he *Cohen* Court held § 523(a)(2)(A) prevents the discharge of all liability arising from the fraud, including treble damages which do not represent money the debtor obtained."); *In re Crespin*, 551 B.R. 886, 902 (Bankr. D.N.M. 2016) (citing *Cohen*, the court held that "[t]he nondischargeable debt is the amount of damages arising from the non-dischargeable conduct"). The inquiry is one of causation. *See., e.g., In re Munoz*, 592 B.R. 736, 745 (D. Colo. 2018). If the damages would not have been awarded but for the fraud, they are nondischargeable.

Having ruled that Defendant defrauded Plaintiff, the Court must determine what damages arose from the fraud.

Plaintiff's state court complaint includes allegations of conversion, breach of duty, forgery, fraud, violation of state corporate governance laws, and embezzlement. Based on the complaint alone, it would be difficult to assign damages to the various alleged wrongful acts.

The state court judgment, however, is another story. The sole wrongful act mentioned in the judgment as the cause of Plaintiff's damages is fraud. Paragraph 2 of the judgment provides:

> Defendants are liable for violations of the prohibitions on financial elder abuse as provided by ORS 124.100 by way of the Defendants and each of them having engaged in a scheme designed to deprive the Plaintiffs of money through artifice, false pretenses, and fraud which were established clearly and convincingly. All named Defendants were conduits and vehicles for fraud and were alter egos of Defendant Ramin Zamani, aka Ramin Zamani-Zadesh. The total financial loss from such artifice and frauds to Plaintiffs, inclusive of statutory pre-judgment interest, is in the sum of $233,955.17.

The judgment goes on to award $100,000 of "non-economic" damages based on Defendant's fraud. The judgment then trebles both damage awards pursuant to Oregon's Abuse of

Vulnerable Person statute. Finally, the state court awarded post-judgment interest at the Oregon statutory rate. The Court concludes that all the damages awarded in the state court judgment arose from Defendant's nondischargeable conduct, i.e., fraud. The damages are nondischargeable under § 523(a)(2)(A).

## Conclusion

Plaintiff is entitled to a declaratory judgment that all amounts owed under the state court judgment are nondischargeable under § 523(a)(2)(A). A separate judgment will be entered.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: May 11, 2023
Copies to: counsel of record