UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

RAMIN ZAMANI-ZADEH,                                          No. 20-11939-t7

      Debtor.

TAEKI MARTIN, et al.,

      Plaintiffs,

v.                                                           Adv. No. 20-1077-t

RAMIN ZAMANI-ZADEH,

      Defendant.

## **<u>REPUBLISHED OPINION</u>**

      Before the Court is a judgment of the District Court remanding this adversary proceeding for additional findings and conclusions of law. This opinion is the Court's attempt to comply with the directions of the District Court. As set forth below, the Court finds and concludes that a portion of Defendant's state court judgment debt to Plaintiff is nondischargeable under § 523(a)(2)(A).[1]

A.    <u>Facts</u>.[2]

    The Court finds:[3,4]

---

[1] Unless otherwise indicated, all statutory references are to 11 U.S.C.

[2] The Court takes judicial notice of the docket in this adversary proceeding and the state court complaint, answer, and judgment that are the subject of the proceeding. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may sua sponte take judicial notice of its docket and of facts that are part of public records).

[3] Some of the Court's findings are in the discussion portion of the opinion. They are incorporated by this reference.

[4] All monetary figures are rounded to the nearest dollar.

| Finding of Fact | Citation to the trial record |
|---|---|
| In 2008, Defendant Ramin Zamani-Zadeh had 12 years of restaurant experience and 8 years of construction experience. | Trial Transcript, doc. 79, filed 9/1/2023 (the "Trial Transcript"), p. 4 (p. 12)[5] (lines 23-23). |
| Defendant served a sentence for bank fraud in an Oregon prison. | Trial Transcript, p. 12 (p. 45) (lines 6-20). |
| In prison, Defendant met Steve Martin ("Martin"). | Trial Transcript, p. 3 (p. 8) (lines 2-3). |
| At the time Martin was about 29 years old. | *Martin, et al v. Zamani et al*, Multnomah County Case No. 0901-01452. Testimony of Plaintiff Taeki Martin, audio recording of trial ("Plaintiff's Testimony"), February 22-23, 2010, at 10:37:50 a.m. to 10:37:57 a.m.[6] |
| Martin was serving a five-year sentence for drug dealing. | Trial Transcript, p. 12 (p. 44) (lines 20-23); Plaintiff's Testimony, 10:42:00 a.m. to 10:42:16 a.m. |
| Defendant told Martin that Defendant wanted to start a business after he got out. | Trial Transcript, p. 3 (p. 8) (lines 12-13). |
| Defendant and Martin discussed a funding source for the venture. | Trial Transcript, p. 4 (p. 11) (lines 8-22). |
| Martin told Defendant that Martin's mother, Plaintiff Taeki Martin, might be willing to invest in the business. | Trial Transcript, p. 13 (p. 46) (line 17-21). |
| At the time, Plaintiff was 68 years old. She was born August 3, 1939. | Plaintiff's Testimony, 10:33:20 a.m. to 10:33:40 a.m. |
| Plaintiff was a widow. Her husband died in 2001. | Plaintiff's Testimony, 10:33:45 a.m. to 10:33:55 a.m., and 10:38:15 a.m. to 10:38:22 a.m. |
| Plaintiff was a native of South Korea. | Plaintiff's Testimony, 10:33:40 a.m. to 10:33:45 a.m. |
| Plaintiff's English was very limited. | Plaintiff's Testimony, 10:45:40 a.m. to 10:48:10 a.m. |
| At some point, Martin suggested that Plaintiff mortgage her house in the Seattle, Washington area to raise money and invest the proceeds in Defendant's business venture. | Trial Transcript, p. 12 (p. 44) (lines 10-19). |
| The house, on which Plaintiff owed between $7,000 and $8,000, was her primary asset. | Plaintiff's Testimony, 10:38:25 a.m. to 10:39:08 a.m. |

[5] The page numbers in parentheses are to the "mini pages" (4 to a page) in each page of the transcript.

[6] All times are to the February 22, 2010, testimony unless otherwise indicated.

| | |
|---|---|
| At the time, Plaintiff's income was about $2,300 per month. | Plaintiff's testimony, 10:40:00 a.m. to 10:41:12 a.m. |
| Martin told Plaintiff that Defendant and Defendant's father would "help her out" to start up a business. | Plaintiff's Testimony, 10:44:15 a.m. to 10:44:49 a.m. |
| Martin told Plaintiff that Defendant had 17 years' experience in the restaurant business and was trustworthy. | Plaintiff's Testimony, 10:50 50 a.m. to 10:51:05 a.m. |
| Defendant was a trustworthy person, according to Martin. | Plaintiff's Testimony, 10:50:30 to 10:50:47 |
| If and when Martin was released from prison he had to do something, so Martin wanted Plaintiff to get involved with Defendant's father to start up a business, as she had good credit. | Plaintiff's Testimony, 10:50:47 to 10:51:04. |
| Martin told Plaintiff that Defendant had been in jail because he had been involved in some kind of tax incident or problem. | Plaintiff's Testimony, 10:51:10 a.m. to 10:51:50 a.m. |
| When Defendant was released from prison he met with Plaintiff at her house. | Plaintiff's Testimony, 10:43:20 a.m. to 10:43:35 a.m. |
| Martin told Plaintiff that Defendant would be visiting. | Plaintiff's Testimony, 10:43:45 a.m. to 10:44:02 a.m. |
| The meeting was in January or February 2008. | Plaintiff's Testimony, 10:48 00 a.m. to 10:48:56 a.m. |
| Martin was still in jail when Defendant first met with Plaintiff. | Plaintiff's Testimony, 10:43:35 a.m. to 10:43:45 a.m.; and Trial Transcript, p. 13 (p. 46) (lines 5-9). |
| Defendant and Plaintiff agreed that Plaintiff and Defendant's father would go into the restaurant business together. | Trial Transcript, p. 4 (p. 12) (lines 15-19). |
| Defendant's vision for the restaurant was "an elegant, high-class restaurant and entertainment bar/grill." | Trial Transcript, p. 4 (p. 13) (lines 1-2). |
| Defendant told Plaintiff that if she would invest half of the money needed for the restaurant venture, Defendant and his father would invest the other half. | Trial Transcript, p. 4 (p. 11) (lines 19-22); Plaintiff's Testimony, 10:53:37 a.m. to 10:54:10 a.m. |
| Plaintiff's understanding was that the profits from the restaurant would be divided 50/50. | Plaintiff's Testimony, 10:54:05 a.m. to 10:54:31 a.m. |
| Plaintiff's capital contribution to the business was $194,644. | Trial Transcript, p. 13 (p. 48) (lines 14-17). |
| The only other capital contribution was an $80,000 loan to Defendant from Defendant's parents. Defendant put the $80,000 into the business. | Trial Transcript, p. 6 (p. 21) (lines 15-21). |
| On March 3, 2008, Defendant forged Plaintiff's signature on an application for an American Express credit card and obtained an American Express credit card in Plaintiff's name. | Plaintiff's testimony, 11:16:57 a.m. to 11:19:00 a.m. |

| | |
|---|---|
| On March 18, 2008, Defendant formed Zamani Entertainment, LLC, a Washington limited liability company ("Zamani Entertainment"). | Trial Transcript, p. 13 (p. 47) (line 13-19). |
| Plaintiff was to own half of Zamani Entertainment. | Trial Transcript, p. 4 (p. 11) (lines 19-22). |
| Plaintiff only received a 25% interest in Zamani Entertainment. | Trial Transcript, p. 17 (p. 63) (lines 19-25). |
| Plaintiff mortgaged her house for $202,000 and obtained cash proceeds of $194,644, which she deposited into a newly opened Zamani Entertainment account at US Bank. | Plaintiff's Testimony, 10:55:35 a.m. to 10:58:06 a.m. |
| Plaintiff invested the mortgage proceeds in the restaurant venture because she trusted Defendant. | Plaintiff's Testimony, 10:54:35 a.m. to 10:55:20 a.m. |
| Defendant was supposed to make the payments under the mortgage. Defendant stopped making payments after about 5 or 6 months. | Plaintiff's Testimony, 10:58:06 a.m. to 10:58:45 a.m. |
| Defendant contacted brokers and looked for a restaurant location in Seattle. | Trial Transcript, p. 4 (p. 13) (lines 3-14). |
| Plaintiff and Defendant looked at several Seattle locations and were interested in one but did not sign a lease. | Trial Transcript, p. 4 (p. 13) (lines 10-12). |
| Defendant and Plaintiff then began looking for a location in Portland, Oregon. | Trial Transcript, p. 4 (p. 13) (lines 11-14). |
| Eventually they found a building that formerly was operated as the House of Gold restaurant. | Trial Transcript, p. 4 (p. 13) (lines 11-23). |
| The lowest bid from a contractor to remodel the House of Gold was $250,000. This did not include the cost of stocking the restaurant and bars. | Trial Transcript, p.10 (p. 37) (lines 5-8). |
| Obtaining a liquor license was essential to Defendant's business plan. | Trial Transcript, p. 4 (p. 13) (lines 1-2). |
| However, Defendant understood that under Oregon law, liquor licenses could not be issued to businesses owned by convicted felons.[7] | Trial Transcript, p. 18 (p. 69) (lines 18-23). |
| Because of that, even though Defendant was a co-owner of Zamani Entertainment he was never listed as an owner. | Trial Transcript, p. 20 (p. 75-76) (lines 22-25 and 1-12); p. 6 (p. 18)(lines 8-11; 22-25); p. 7 (p. 22) (lines 12-14). |

---

[7] Defendant's understanding was correct. *See* the 2008 version of O.R.S. § 471.313(4)(d) (the Oregon Liquor Control Commission can refuse to issue a license to anyone who "[h]as been convicted ... at any time of a felony.").

| | |
|---|---|
| Instead, Defendant's father was put on all legal documents as an owner.[8] | Trial Transcript, p. 20 (p. 75) (lines 3-6). |
| Plaintiff wanted her son Martin to be an owner of the restaurant, so he would have a useful occupation after he was released from prison. | Plaintiff's Testimony, 10:50:50 a.m. to 10:51:00 a.m. |
| Martin was part of the restaurant venture. | Trial Transcript, p. 3 (p. 8) (lines 12-14), p. 12. (p. 44) (line 15-19), and p. 20 (p. 77) (line 6-21). |
| Because of his criminal conviction, Martin was never listed as an owner of Zamani Entertainment. | Trial Transcript, p. 16 (p. 60) (lines 8-16); p. 20 (p. 75) (lines 9-12). |
| At some point in the spring or early summer of 2008, Martin was released from prison and sent to a halfway house in the Seattle area. | Trial Transcript, p. 6 (p. 20) (lines 2-9). |
| Martin resided at the halfway house but was able to go to Portland on the weekends. | Trial Transcript, p. 20 (p. 74) (lines 9-21); Trial Transcript, p. 20 (p. 77) (lines 6-12). |
| Contrary to his mother's hopes and wishes, Martin continued to associate with the same, or same type of, people he associated with before he went to prison. | Trial Transcript, p. 21 (pp. 78-79) (lines 19-25 and 1-4). |
| Defendant described it as a drug-dealing lifestyle. | Trial Transcript, p. 21 (p. 78) (lines 24-25). |
| In May 2008, Defendant and Martin bought a boat, using $6,104 from the Zamani Entertainment bank account and a loan for $21,099 that Defendant obtained in Plaintiff's name. | Trial Transcript, p. 14 (pp. 50-52) (lines 19-25 and 1-25 and 1-7). |
| Plaintiff knew nothing about the boat or the loan for the boat. | Plaintiff's testimony, 11:31:30 a.m. to 11:31:53 a.m. |
| There are pictures of Martin, Defendant, and an unknown women "partying" in the boat. | Trial Transcript, p. 14 (p. 52) (lines 8-13). |
| Plaintiff and Defendant obtained a credit card from Bank of America, applying over the phone, that was to be used for business expenses. | Plaintiff's Testimony, 10:59:15 a.m. to 11:00:25 a.m. |
| Defendant pretended to be Martin to get the Bank of America card. | Plaintiff Testimony, 11:00:25 a.m. to 11:01:03 a.m. |
| Plaintiff thought the American Express card was in Defendant's name. | Plaintiff's Testimony, 11:18:55 a.m. to 11:23:25 a.m. |
| Using the American Express card, Defendant or Martin bought clothing, expensive dinners, and trips for Martin. | Trial Transcript, p. 15 (p. 54) (lines 2-8); Trial Transcript, p. 15 (p. 56-57) (lines 6-25 and 1-9). |

---

[8] This fraudulent gambit should not work. *See* the 2008 version of O.R.S. § 471.313(4)(h) (the Oregon Liquor Control Commission can refuse to issue a license to anyone who "[i]s not the legitimate owner of the business proposed to be licensed, or other persons have ownership interests in the business which have not been disclosed.").

| | |
|---|---|
| In June 2008, Defendant caused Zamani Entertainment to have cashier's checks issued from its Bank of the West account totaling $75,000. The cashier's checks were deposited into an account at Bank of the West established by Defendant for Elite Limousine. | Trial Transcript, p. 18 (p. 66) (lines 11-21). |
| Zamani caused Elite Limousine to buy a "limousine" to take restaurant customers home if they had had too much to drink. | Trial Transcript, p. 7 (p. 22) (lines 15-20). |
| In October 2008, Defendant caused Zamani Entertainment to pay an additional $77,396 for limousine repairs and expenses. | Trial Transcript, p. 18 (p. 66) (lines 22-25). |
| At least $152,396 of Zamani Entertainment funds were transferred into Elite Limousine accounts. | Trial Transcript, p. 18 (p. 66) (lines 11-21) and p. 18 (p. 66) (lines 22-25). |
| Martin had possession of or access to Zamani Entertainment credit cards and also to credit cards in Plaintiff's name that Defendant had obtained. | Trial Transcript, p. 18 (p. 67) (lines 17-21). |
| The credit cards were issued by Bank of America, Washington Mutual, Bank of the West, and American Express. | Trial Transcript, p. 14 (p. 53) (lines 24-25); p. 15 (p. 54) (lines 1-25); p. 15 (p. 56) (lines 6-20); and p. 16 (p. 58) (lines 10-17). |
| Martin used the credit cards for all his expenses, including his day-to-day living expenses. | Trial Transcript, p. 18 (p. 67) (lines 17-21). |
| Other than the American Express card (about which she knew nothing) and the Bank of America card (obtained with her knowledge and approval), it is not clear how much Plaintiff knew about, or was involved in opening, the credit card accounts that were in her or Zamani Entertainment's name. | Plaintiff's Testimony, 10:59:20 a.m. to 11:30:05 a.m. |
| Plaintiff never was aware of, or authorized, Martin or Defendant to use her personal or any business credit cards for any non-business expenses. | Plaintiff's Testimony, 11:11:20 a.m. to 11:20:00 a.m. |
| The lease for the former House of Gold building was signed on June 25, 2008. | Defendant's Trial Ex. A at 1. |
| The space was remodeled by Defendant between June 25, 2008, and September 2008. | Trial Transcript, p. 5 (p. 14) (lines 20-22) and p. 9 (p. 32) (line 6). |
| The remodeled premises featured a restaurant and bar downstairs and a bar/nightclub upstairs. | Trial Transcript, p. 6 (p. 18) (lines 8-11). |
| The remodeled premises apparently violated the Oregon Fire Code. | Trial Transcript, p. 24 (pp. 90) (lines 11-20). |
| In July 2008 Defendant, through an attorney, drafted an LLC Interest Purchase Agreement (the "Purchase Agreement"), which obligated Plaintiff to pay Defendant $480,000 for 75% of Zamani Entertainment. | Trial Transcript, p. 16 (pp. 59-60) (lines 1-7 and 20-25). |

| | |
|---|---|
| Plaintiff's obligations under the Purchase Agreement included a $50,000 down payment and monthly payments of $13,673. | Trial Transcript, p. 16 (p. 60) (lines 1-7). |
| Defendant got Plaintiff to sign the Purchase Agreement. | Trial Transcript, p. 16 (pp. 59) (lines 20-25). |
| Defendant represented to Plaintiff that the Purchase Agreement was necessary so Defendant could tell the Oregon Liquor Control Commission that Plaintiff owned the entire business. | Plaintiff's Testimony, 11:36:30 a.m. to 11:41:40 a.m. |
| In July 2008 or later, Defendant told Plaintiff that Defendant could not be involved with a liquor license because of his criminal record. | Plaintiff's Testimony, 11:41:00 a.m. to 11:41:24 a.m.. |
| Defendant represented to Plaintiff that the payments required under the Purchase Agreement would be made from her restaurant profits. | Plaintiff's Testimony, 11:45:55 a.m. to 11:46:30 a.m. and 11:58:35 a.m. to 11:58:40 a.m. |
| At all times, during construction and when the restaurant was operating, Defendant controlled and managed the business venture and its finances. | Plaintiff's Testimony, 11:46:30 a.m. to 11:48:02 a.m. |
| The restaurant, named Ibiza, opened in September 2008. | Trial Transcript, p. 6 (p. 21) (line 5), and p. 9 (p. 32) (lines 6-9). |
| The restaurant opened with a temporary liquor license. | Trial Transcript, p. 18 (p. 69) (lines 4, 23-25). |
| During the time the restaurant was open, it made very little if any profit. | Trial Transcript, pp. 6-7 (pp. 21-22) (lines 22-25 and 1-3). |
| The restaurant was not able to generate enough cash to pay its rent. | Trial Transcript, p. 18 (p. 69) (lines 3-17). |
| One problem Ibiza had was that Martin would come to the restaurant when he could get away from the halfway house and "drink the profits." | Trial Transcript, p. 20 (pp. 76-77) (lines 22-25 of page 76 and lines 1-21 of page 77). |
| Defendant did not tell Plaintiff about Martin's "drug dealing lifestyle" or his "drinking the profits." | Trial Transcript, p. 21 (p. 78) (lines1-6 and 19-25). |
| On December 31, 2008, Defendant issued a default letter to Plaintiff stating that her interest in Zamani Entertainment had been forfeited because of her default under the Purchase Agreement. | Trial Transcript, p. 17 (pp. 62-63) (lines 13-25 and 1-25), and p. 20 (pp. 77) (lines 16-17). |
| Plaintiff did not know until much later that Defendant tried to forfeit her interest in Zamani Entertainment. | Plaintiff's Testimony, 11:57:54 a.m. to 11:58:38 a.m. |
| Plaintiff did not recall getting a notice of default and was only made aware of it after the fact by her lawyer. | Plaintiff's Testimony, 11:55:25 a.m. to 11:57:54 a.m. |
| Defendant testified that he sent the default notice because he was afraid that Plaintiff would try to kick him out of the business that they had built together. | Trial Testimony, p. 16 (p. 61) (lines 4-8). |
| Ibiza closed on January 30, 2009. | Trial Transcript, p. 18 (pp. 68-69) (lines 4-25 and 1-17). |

| | |
|---|---|
| Plaintiff never received any money from the restaurant. | Plaintiff's Testimony, 11:06:07 to 11:06:32 and 11:48:10 a.m. to 11:48:40 a.m. |
| The temporary liquor license was not renewed after it expired in January 2009. | Trial Transcript, p. 18 (p. 69) (lines 18-23). |
| The permanent liquor license could not be obtained because the fire marshal may have ordered that the restaurant premises not be approved. | Trial Transcript, p. 24 (pp. 90) (lines 11-20). |
| Plaintiff sued Defendant, Zamani Entertainment (Oregon LLC), and several of their affiliates in Oregon state court in January 2009, bringing claims for violation of Oregon's Abuse of a Vulnerable Person statute (ORS § 124.100 et seq.); conversion; making wrongful corporate/LLC distributions; and to expel Defendant as a member of Zamani Entertainment and affiliated LLCs. | Case 20-1077, doc. 7-1, filed April 26, 2021, pp. 3-11. |
| Defendant answered the complaint through counsel but failed to appear at the trial on the merits, scheduled for February 22, 2010. | Case 20-1077 Doc. 7-1, pp. 12-15. |
| Plaintiff examined witnesses and introduced documentary evidence at the unopposed trial. | Plaintiff's Testimony; Case 20-1077 Doc. 7-1, p. 15 (the "Judgment"). |
| Plaintiff testified about non-economic damages. She testified [paraphrased]:<br><br>I really believed Defendant. After my son was released from the jail, Defendant told me that once I get my mortgage loan, Defendant would take care of everything. When my son was released from prison I was going to buy a car for him. But Zamani said he would take care of that so I did not have to worry. I rented a car for my son. I used my Discover credit card to rent the car. Defendant showed me three different "licenses," one for me, one for him, and one for my son, so I didn't need to buy a car. The rental cost was more than $10,000. I am paying that off. I am also making the mortgage payments, which were in arrears. The credit card payments were close to $300 but now are down to $230. It was really hard for me to make the credit card and mortgage payments. We had mutual bonds and some other bonds. I used all the assets I had to make the payments. It has been very difficult for me because this case has been dragged on. I am barely making ends meet. Even coming to the court is hard. I cannot go to sleep at night without taking pills. I had no idea Zamani had been using me to this scale. I had no idea. I was really surprised and | Plaintiff's Testimony, February 23, 2010, 2:54:00 p.m. to 3:00:45 p.m. |

| | |
|---|---|
| upset. The reason I can endure is because I believe in God. That is how I have been surviving. | |
| On May 14, 2010, the state court entered a judgment of $1,001,866 in favor of Plaintiff and Zamani Entertainment against Defendant and others under Oregon's Abuse of Vulnerable Person statute. The judgment included $233,955 in "economic damages," $100,000 in "non-economic" damages, and treble damages. The judgment accrues interest at 9% and remains unpaid. | Judgment. |
| The judgment included the following: The Court makes a specific finding that the lease documents executed in favor of Lease Company of America do not bear the genuine signature of Plaintiff Martin, but rather represent forgeries by Defendant Ramin Zamani, aka Ramin Zamani-Zadeh. | Judgment. |
| The judgment also included the finding that all named defendants are alter egos of Defendant. | Judgment. |
| The judgment finds and concludes: Defendants are liable for violations of the prohibitions on financial elder abuse as provided by ORS 124.100 by way of Defendants and each of them having engaged in a scheme designed to deprive the Plaintiffs of money through artifice, false pretense, and fraud which were established clearly and convincingly. | Judgment. |
| Defendant filed this no-asset chapter 7 case on October 7, 2020, and was granted a discharge on August 17, 2021. | Case 20-11939 doc. 1, and doc. 20. |
| Plaintiff filed this adversary proceeding on December 30, 2020. | Case 20-1077 doc. 1. |

B.    <u>Issue Preclusion Establishes Two Facts</u>.

The Court earlier denied Plaintiff's motion for summary judgment based on issue preclusion. *See* Doc. 19, filed August 12, 2021, in this adversary proceeding. The Court stands by that ruling—in this matter, issue preclusion was not a sufficient ground to grant summary judgment. However, the Court rules that two subsidiary findings of fact by the Oregon court, i.e.,

- All named defendants were conduits and vehicles for fraud and were alter egos of Defendant Ramin Zamani, aka Ramin Zamani-Zadeh; and

- The court makes a specific finding that the lease documents executed in favor of Lease Company of America do not bear the genuine signature of Plaintiff Martin, but rather represent forgeries by Defendant Ramin Zamani, aka Ramin Zamani-Zadeh,

are entitled to preclusive effect under applicable Oregon and federal law. In so ruling, the Court finds and concludes that the parties were the same; the causes of action were different; and the issues were actually litigated during the lengthy default judgment hearing. *See In re Bond*, 548 B.R. 570, 576 (Bankr. D. Or. 2016), and the Court's opinion entered in this adversary proceeding on August 21, 2021, doc. 19, pp. 8-12.

C.     <u>No Reliance on the State Court Complaint or Unadopted Statements of Plaintiff's Counsel for the Truth of the Matters Asserted Therein</u>.

As set forth in the facts table, the Court did not and does not rely on the state court complaint or the unadopted statements of Plaintiff's counsel made during the state court trial to establish the truth of any facts.

D.     <u>Section 523(a)(2)(A); False Representations, False Pretenses, or Actual Fraud</u>.

Section 523(a)(2)(A) prohibits the discharge of a debt "for money . . . to the extent obtained by . . . false pretenses, a false representation, or actual fraud[.]" To prevail in her § 523(a)(2)(A) claim, Plaintiff must prove the requisite facts by a preponderance of the evidence. *In re Young*, 91 F.3d 1367, 1373 (10th Cir. 1996).

1.     <u>False Pretenses</u>.

"False pretenses under Section 523(a)(2)(A) are implied misrepresentations intended to create and foster a false impression" and "'can be defined as any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor.'" *Bank of Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 223 (10th Cir. BAP 2013) (quoting *Stevens v. Antonious (In re Antonious)*, 358 B.R. 172, 182 (Bankr. E.D. Pa. 2006)). "Intent to deceive can be inferred from the totality of the circumstances." *Id.* at 222 (citing *Copper v. Lemke (In re Lemke)*, 423 B.R. 917, 922 (10th Cir. BAP 2010)).

*Woods*, 660 B.R. 905, 920, n.45 (10ᵗʰ Cir. BAP 2024); *see also In re Osborne*, 520 B.R. 861, 869 (Bankr. D.N.M. 2014) (same).

> [F]alse pretenses include conduct and material omissions. *See Marks v. Hentges (In re Hentges),* 373 B.R. 709, 725 (Bankr. N.D. Okla. 2007) (false pretenses are "implied misrepresentations or conduct intended to create and foster a false impression.") (internal quotations omitted).

*In re Woods*, 616 B.R. 803, 812-13 (Bankr. N.D. Okla. 2020). A false pretenses claim presents the issue of "whether, by silence, insinuation, or inference, [the d]ebtor knowingly acted in [a way] as to create a false impression in the mind of [the creditor]" about the transaction at issue. *Id* at 813.

The elements of a nondischargeability proceeding based on false pretenses are:

> (1) The debtor made a false representation [or omission];
> (2) The debtor made the representation [or omission] with the intent to deceive the creditor;
> (3) The creditor relied on the representation [or omission];
> (4) The creditor's reliance was justifiable; and
> (5) The debtor's representation [or omission] caused the creditor to sustain a loss.

*In re Woods*, 660 B.R. 905, 918 (10ᵗʰ Cir. BAP 2024) (citing *In re Young*, 91 F.3d 1367, 1373 (10ᵗʰ Cir. 1996)); *see also In re Osborne*, 520 B.R. 861, 868 (Bankr. D.N.M. 2014) (same).[9]

    2.   <u>False Representation</u>. "False representations are representations knowingly and fraudulently made that give rise to the debt." *Osborne*, 520 B.R. at 868, quoting *In re Sutherland–Minor*, 345 B.R. 348, 354 (Bankr. D. Colo. 2006), *see also In re Lewis*, 271 B.R. 877, 885 (10th Cir. BAP 2002) (same); *In re Johnson-Battle*, 599 B.R. 769, 783 (Bankr. D.N.J. 2019) (to the same effect). The elements of a nondischargeability action based on false representation are the same as for false pretenses. *Woods*, 660 B.R. at 918; *Young*, 91 F.3d at 1373.

---

[9] Both false pretenses and false representation are inducement-based frauds. *Woods*, 660 B.R. at 918 and 920 n.45.

3.     <u>Actual Fraud</u>. The term "actual fraud" in § 523(a)(2)(A) "denotes any fraud that involves moral turpitude or intentional wrong." *Husky Intern. Elecs., Inc. v. Ritz*, 578 U.S. 356, 360 (2016). It can be proven by showing "a scheme to deprive or cheat [the creditor] of property or a legal right." *In re Vickery*, 488 B.R. 680, 690 (10th Cir. BAP 2013); *see also* 4 Collier on Bankruptcy ¶ 523.08[1][e] (16th ed.) (actual fraud is "a deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with the design of perpetrating what is known to be a cheat or deception.").

> The Supreme Court ruled that "actual fraud" is difficult to define precisely but "connotes deception or trickery" that is "done with wrongful intent," and the fraud must be "actual" "in contrast to 'implied' fraud or fraud 'in law.'" The Supreme Court held: (a) "[t]he term 'actual fraud' in § 523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation," and (b) proof of reliance is not required to except a debt from discharge under § 523(a)(2)(A) based on a fraud that is not an inducement-based fraud, such as a fraudulent conveyance scheme.

*Woods*, 660 B.R. 905, 917 (10th Cir. BAP 2024) (discussing *Husky*); *see also In re Thompson*, 555 B.R. 1, 10) (10th Cir. BAP 2016) (for actual fraud, there is no requirement that the creditor rely on the fraud or part with assets at the inception of, or concurrently with, the fraud, nor is there a requirement that the fraud induce the creditor to part with property).

The "actual fraud" prong of § 523(a)(2)(A) requires that a creditor prove the following elements:

> (1) Fraud;
> (2) Wrongful intent, as opposed to constructive or implied fraud;
> (3) The debtor obtained "money, property, services, or . . .credit" by the actual fraud; and
> (4) The subject debt arises from the actual fraud.

*In re Thompson*, 555 B.R. 1, 10-14 (10th Cir. BAP 2016); *see also In re Jahelka*, 442 B.R. 663, 669 (Bankr. N.D. Ill. 2010) (abrogated on other grounds by *Husky Int'l Electronics, Inc. v. Ritz*,

578 U.S. 355 (2016)); *In re Eisenstein*, 525 B.R. 428, 439 (Bankr. N.D. Ill. 2015) (to the same effect); *Liebl*, 434 B.R. at 538 (same).

E.    <u>Material Omissions and the Duty to Disclose</u>.

    1.    <u>Material omissions can constitute false pretenses</u>.

False pretenses under Section 523(a)(2)(A) are implied misrepresentations intended to create and foster a false impression. Unlike false representations, which are express misrepresentations, false pretenses include conduct and material omissions. *See Marks v. Hentges (In re Hentges)*, 373 B.R. 709, 725 (Bankr. N.D. Okla. 2007) (false pretenses are "implied misrepresentations or conduct intended to create and foster a false impression.") (internal quotations omitted). False pretenses can be "defined as any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor." *Stevens v. Antonious (In re Antonious),* 358 B.R. 172, 182 (Bankr. E.D. Pa. 2006) (citing *Rezin v. Barr (In re Barr),* 194 B.R. 1009, 1019 (Bankr. N.D. Ill. 1996)).

*In re Sturgeon*, 496 B.R. 215, 223 (10th Cir. BAP 2013).

A false pretense as used in § 523(a)(2)(A) includes material omissions, and means "implied misrepresentations or conduct intended to create and foster a false impression." An overt misrepresentation is not required, because "omissions or a failure to disclose on the part of the debtor can constitute misrepresentations for purposes of nondischargeability where the circumstances of the case are such that omissions or failure to disclose create a false impression which is known by the debtor."

*In re Perkins*, 298 B.R. 778, 788 (Bankr. D. Utah 2003) (footnotes omitted).

    2.    <u>Material omissions can also be false representations</u>.

In appropriate circumstances, material omissions can constitute false representations. See e.g., *In re Piccolomini,* 87 B.R. 385, 387 (Bankr. W.D. Pa. 1988).

*In re Howarter*, 95 B.R. 180, 187 (Bankr. S.D. Cal. 1989).

When a debtor has an affirmative duty to disclose information, the failure to convey the information may be considered a false representation for purposes of Section 523(a)(2). *Fowler,* 91 F.3d at 1374–75. Moreover, "false pretense[s] as used in § 523(a)(2)(A) includes material omissions, and means 'implied misrepresentations or conduct intended to create and foster a false impression.'" *William W. Barney,*

> *M.D. P.C. Retirement Fund v. Perkins (In re Perkins),* 298 B.R. 778, 788 (Bankr. D. Utah 2003), *quoting Peterson v. Bozzano (In re Bozzano),* 173 B.R. 990, 993 (Bankr. M.D.N.C. 1994) (abrogated on other grounds). "An overt misrepresentation is not required, because 'omissions or a failure to disclose on the part of the debtor can constitute misrepresentations for the purpose of nondischargeability where the circumstances of the case are such that omissions or failure to disclose create a false impression which is known by the debtor.'" *Id.*

*In re Hentges*, 373 B.R. 709, 725 (Bankr. N.D. Okla. 2007); *see also In re Bozzano*, 173 B.R. 990, 993 (Bankr. M.D.N.C. 1994) (abrogated on other grounds by *Cohen v. de la Cruz*, 523 U.S. 213 (1998)) (citing *In re Booker*, 165 B.R. 164 (Bankr. M.D.N.C. 1994)) (omissions or a failure to disclose on the part of the debtor can constitute misrepresentations for purposes of nondischargeability where the circumstances of the case are such that omissions or failure to disclose create a false impression which is known by the debtor).

     3.   <u>The duty to disclose</u>. Restatement (Second) of Torts, Section 551, provides:

> (1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.
> (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
>> (a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and
>> (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and
>> (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and
>> (d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and
>> (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

This standard is commonly used by bankruptcy courts in § 523(a)(2)(A) cases. *See, e.g., In re Belice*, 461 B.R. 564, 580 (9th Cir. BAP 2011); *In re Miller*, 2025 WL 40884, at *8 (Bankr. C.D. Cal.); *In re Bloom*, 622 B.R. 366, 414 (Bankr. D. Colo. 2020); *In re Davis*, 494 B.R. 842, 872-73 (Bankr. D.S.C. 2013) *In re Borschow*, 454 B.R. 374, 395-96 (Bankr. W.D. Tex. 2011); *In re Hentges*, 373 B.R. at 725; and *In re Perkins*, 298 B.R. 778, 788 (Bankr. D. Utah 2003). The Court will use it as well.

The Court finds that Defendant had a duty to disclose all material facts regarding the proposed restaurant venture and Plaintiff's purchase of a membership interest in Zamani Entertainment, for the reasons listed in the Restatement (Second) of Torts §551(2) (a), (b), (c), and (e).

a.     <u>Fiduciary duty or similar relation of trust and confidence</u>. Under Washington law, the managing member of a limited liability company owes fiduciary duties to the company and to other members. *See Dragt v. Dragt/DeTray, LLC*, 139 Wash. App. 560, 574-75 (2007) (only the managing member of a Washington LLC has fiduciary duties to other members); *Braddock v. Zaycon Foods, LLC*, 2019 WL 3974355, at *7 n. 5 (W.D. Wash.) (citing and following *Dragt*). Although the Zamani Entertainment operating agreement is not in evidence, the Court finds that Defendant was at all times the manager of Zamani Entertainment. Plaintiff was a purely passive member. As such, Defendant owed fiduciary duties to Plaintiff.

Furthermore, there was a relation of trust and confidence because of Defendant's experience and sophistication and Plaintiff's age, education, lack of sophistication, and limited English.

b.     <u>Matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading</u>. Throughout the relationship between

Defendant and Plaintiff, Defendant knew matters that had to be disclosed to prevent his partial or ambiguous statements from being misleading. For example, Defendants represented to Plaintiff that his father would be involved in the restaurant venture. In fact, the father was only named in some of the legal documents but had no role in the venture. Similarly, Defendant said he would be an equal investor in the restaurant business. In fact, he only put in $80,000 of money he borrowed from his parents. Finally, Defendant stated or implied that the money invested was sufficient for the restaurant venture. It may have been sufficient for a modest restaurant that required little remodeling, but was woefully inadequate for Defendant's Ibiza concept, especially after deducting the money wasted on the boat and limousine.

c.   <u>Subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so</u>. Information acquired by Defendant rendered untrue or misleading several of his previous representations. For example, Defendant and Plaintiff agreed that their investment would fund their business venture – the restaurant. However, Defendant used a substantial amount of the capital investment to buy a limousine for another company that only Defendant owned, and to fund Steve Martin's "drug dealer" lifestyle. In addition, once Defendant obtained a construction estimate of at least $250,000 for remodeling the restaurant, he should have told Plaintiff that they did not have enough capital to proceed. Finally, once Defendant realized that Martin was an unreformed drug dealer and financially irresponsible, he should have told Plaintiff that the restaurant venture would fail if Martin was part of it.

e.   <u>Facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of</u>

those facts. Finally, there were facts basic to the restaurant venture as to which Plaintiff was mistaken. Because of the nature of the relationship between Plaintiff and Defendant, Plaintiff would have reasonably expected Defendant to correct her mistaken understanding. For example, Plaintiff apparently was under the impression that Defendant was competent to remodel the restaurant space. Defendant should have told Plaintiff that he was not a qualified contractor and was not competent to do the remodel. When completed, the restaurant apparently did not comply with the Oregon Fire Code. Similarly, Defendant should have told Plaintiff that Zamani Entertainment did not have enough money to remodel, furnish, stock, and operate an "elegant, high-class restaurant and entertainment bar/grill." She was led to believe it did. Defendant should have told Plaintiff that he forged her name on the American Express credit card application, the Lease Company of America lease, and the application for the boat loan. Plaintiff was under the mistaken impression that Defendant was trustworthy and would not forge her signature. Again, Plaintiff was under the mistaken impression that she needed to sign the Purchase Agreement to help Defendant get the needed liquor license. Defendant's father, not Defendant, was listed on all legal documents as an owner of the business venture. Defendant should have told Plaintiff that the real reason for the Purchase Agreement was to divest her of her ownership interest in Zamani Entertainment. Finally, Defendant should have told Plaintiff she was only getting 25% of the LLC membership interest in exchange for her 70.87% capital investment. She mistakenly thought she would get half.

F.    Plaintiff Carried her Burden of Proving the Inducement-Based Frauds of False Pretenses and False Misrepresentation.

Plaintiff carried her burden of proving the elements of a § 523(a)(2)(A) nondischargeability claim based on inducement-based fraud, i.e., false pretenses or false representation.

1.     _False Representations or Omissions_. Defendant made a number of false representations or omissions to Plaintiff, including:

a.     Defendant told Plaintiff that, in return for her investment, she would get half the membership interest in Zamani Entertainment. Plaintiff got only a 25% interest;

b.     Defendant told Plaintiff that he would match her investment in Zamani Entertainment. In fact, he put in only $80,000;

c.     None of the $80,000 was Defendant's own money. Rather, it was his parents' money. Defendant had no "skin in the game";

d.     Defendant did not tell Plaintiff that on March 3, 2008, Defendant forged Plaintiff's signature on an application for an American Express credit card, opened a credit card account and obtained an American Express credit card in Plaintiff's name;

e.     Defendant did not tell Plaintiff that he was in prison for bank fraud;

f.     Defendant did not tell Plaintiff that all the money he took from Zamani Entertainment and gave to Elite Limousine benefitted himself only (through his sole ownership of Elite Limousine) rather than Plaintiff through her membership interest in Zamani Entertainment;

g.     Defendant did not tell Plaintiff that her son continued to live a "drug dealer lifestyle" funded by Zamani Entertainment after he got out of prison, jeopardizing the success of Zamani Entertainment;

h.     Defendant did not tell Plaintiff that he used Zamani Entertainment money to buy a boat;

i.     Defendant did not tell Plaintiff that he applied for and obtained a loan in her name to finance the purchase of the boat;

j.     Defendant did not tell Plaintiff that the Purchase Agreement allowed him to forfeit her interest in Zamani Entertainment if she failed to make the monthly payments, even though Defendant knew Plaintiff had no money with which to make any such payments;

k.     Defendant did not tell Plaintiff that he forged her signature on a lease with Lease Company of America;

l.     Defendant did not tell Plaintiff that Zamani Entertainment could not afford to make any payments under the Purchase Agreement;

m.     Defendant did not tell Plaintiff that payments allegedly due under the Purchase Agreement were not being made by Zamani Entertainment, causing her to be in default; and

n.     Defendant did not tell Plaintiff the Martin would visit the restaurant from time to time and "drink up the profits."

Misrepresentations "a" through "e" were made before Plaintiff invested her money in Zamani Entertainment.

2.     _Intent to deceive_. The Court finds that Defendant made the material misstatements and omissions with the intent to deceive Plaintiff. The Court finds and concludes that Defendant

was unwilling to tell Plaintiff the truth about his proposed restaurant venture, e.g., that Plaintiff was only getting 25% of Zamani Entertainment in exchange for contributing 70.87% of the capital, and that Defendant's first act in furtherance of the business venture was to forge Plaintiff's signature on an American Express credit card application. Such simple but devastating disclosures would have changed Plaintiff's mind about investing anything in Defendant's restaurant venture. Defendant knew that, so he hid the truth from her.

3.  <u>Reliance</u>. "Actual reliance is the equivalent of causation-in-fact, which is defined as a "substantial factor in determining the course of conduct that results in ... loss." *In re Desouza*, 659 B.R. 288, 296 (Bankr. E.D. Tex. 2024) (citing *In re Mercer*, 246 F.3d 391, 403 (5th Cir. 2001)). Actual reliance "requires little of the creditor." *Id.* The Court finds that Plaintiff relied on Defendant's misrepresentations and omissions. She thought she was Defendant's 50/50 partner and that he was investing as much money in the business as she was. She also thought Defendant had been jailed for a "tax problem," not bank fraud. She trusted him and relied on his misrepresentations and omissions.

4.  <u>Her reliance was justifiable</u>. To prove that reliance was justifiable,

a creditor need not show that it acted consistent with ordinary prudence and care. Instead, to determine whether a creditor's actual reliance was justifiable, the Court applies a subjective standard that takes into account the qualities and characteristics of the particular creditor, not a community standard of conduct applicable to all cases. To justifiably rely, a party is "required to use its senses, and cannot recover if it blindly relies upon a misrepresentation, the falsity of which would be patent to it if it had utilized its opportunity to make a cursory examination or investigation." In other words, justifiable reliance is the standard applicable to a victim's conduct in cases of alleged misrepresentation and ... "[i]t is only where, under the circumstances, the facts should be apparent to one of its knowledge and intelligence from a cursory glance, or it has discovered something which should serve as a warning that it is being deceived, that it is required to make an investigation of its own."

Justifiable reliance on a false representation requires a creditor to make an investigation only if: (1) (a) the creditor discovers a "red flag" (which is a warning

> sign that calls into question the veracity of the representation) or the creditor otherwise is, in fact, suspicious of a deception, or (b) under the circumstances, a red flag should have been obvious to the creditor, taking into account the creditor's knowledge and sophistication, so that the creditor should have been suspicious of a deception; and (2) the red flag or other suspicion indicates that reliance is unwarranted without further investigation. If, after making an investigation, the creditor concludes that the representation is credible, the reliance is justifiable.

*Woods*, 660 B.R. at 921-22 (citing cases) (footnotes omitted). Here, Plaintiff was an unsophisticated, elderly widow with very limited knowledge of English. She was convinced by Defendant that he was an experienced and trustworthy businessman. To someone as naive as Plaintiff, there were no red flags. She did not know Defendant had been convicted of bank fraud, nor that he had forged her signature on a credit card application. If the Defendant had been open and honest with Plaintiff, it would have raised red flags, but she never suspected anything was amiss until Defendant had spent all her money. Plaintiff was not knowledgeable or sophisticated in business or legal matters. Defendant gained Plaintiff's confidence. While a better educated, more sophisticated, and more experienced person might well have been suspicious about Defendant's request for her life savings, the Court finds that Plaintiff justifiably relied on Defendant's misrepresentations and omissions.

5. <u>Plaintiff's reliance caused her to sustain a loss</u>.

> The Supreme Court in *Cohen v. de la Cruz* gave guidance for applying the fifth requirement, explaining that under § 523(a)(2)(A) "'[t]o the extent obtained by' modifies 'money, property, services, or ... credit'—not 'any debt'—so that the exception encompasses 'any debt for money, property, services, or ... credit, to the extent [that the money, property, services, or ... credit is] obtained by' fraud." Applying this construction of § 523(a)(2)(A), the Supreme Court concluded that "[t]he phrase thereby makes clear that the share of money, property, etc., that is obtained by fraud gives rise to a nondischargeable debt.

*Woods*, 660 B.R. at 923 (footnotes omitted). The Court finds that Defendant's misrepresentations and omissions induced Plaintiff to invest her life savings of $194,644, all of which was lost for the reasons, and in the manner, outlined in this opinion.

In sum, the Court finds and concludes that Plaintiff carried her burden of proving that she was the victim of fraud in the inducement (either false pretenses or false representation, or both), which caused her to sustain an actual loss of $194,644.[10]

G.     Alternatively, Plaintiff Carried her Burden of Proving Actual Fraud.

As an alternative finding to fraud in the inducement, the Court finds that the entire restaurant enterprise scheme constituted an "actual fraud" under § 523(a)(2)(A). The Court analyzes the elements of Plaintiff's "actual fraud" claim as follows:

1.     Fraud. As set forth above, there was abundant, ongoing fraud throughout the restaurant venture, from start to finish. After Defendant fraudulently induced Plaintiff to invest her life savings for a 25% interest in Zamani Entertainment, Defendant continued to defraud Plaintiff by, inter alia, buying a boat with Zamani Entertainment's money;[11] transferring $152,396 to Elite Limousine; forging her signature on the Lease Company of America lease; using company credit cards to pay Martin's living expenses; using company credit cards to buy clothing, expensive dinners, and trips; and convincing Plaintiff to sign the Purchase Agreement as a way to cheat her out of her investment.

Draining $158,500 in cash from Zamani Entertainment for the boat and limousine was particularly egregious. Zamani Entertainment was undercapitalized and needed every penny it had. Also egregious was the Purchase Agreement, the default letter, and Defendant's attempt to take away Plaintiff's interest in Zamani Entertainment. From the forged credit card application and the

---

[10] A helpful analogy is the sale of a security in violation of applicable federal or state "anti-fraud" laws. Before 2002, when § 523(a)(19) was added to the Bankruptcy Code, plaintiffs brought nondischargeability actions under § 523(a)(2)(A) for money judgments entered because debtors had made misrepresentations when purchasing or selling securities. *See, e.g., Grogan v. Garner*, 498 U.S. 279 (1991).

[11] $6,104 and obtaining a loan in Plaintiff's name for $21,099 for the remainder of the purchase.

misrepresentations/omissions that induced Plaintiff to invest in the restaurant venture, through the inevitable closure of the restaurant after its short, money-losing life, Defendant committed one fraud or forgery after another. Plaintiff was the perfect "mark" and Defendant took full advantage of her vulnerability. The fraudulent scheme continued until all the money was gone.

2. <u>Wrongful intent</u>. For the reasons given elsewhere in this opinion, the Court finds that Defendant wrongfully intended to defraud Plaintiff out of her life savings. Defendant's repeated acts of fraud and forgery were actual, not implied or constructive. Defendant knew Plaintiff loved her son and wanted to help Martin after he got out of prison. Defendant used this "hook" to con Plaintiff into investing in Zamani Entertainment, with the promise of a successful business venture Martin could step into when he returned to civilian life. Plaintiff's blind love for Martin, together with her other vulnerabilities discussed above, made her an easy target for fraud.

3. <u>Money obtained by the actual fraud</u>. Defendant obtained at least $194,644 from the actual fraud.

4. <u>The subject debt arises from the actual fraud</u>. The Court finds and concludes that a portion of the subject debt arose from the actual fraud. See the discussion below.

G. <u>Debts "Arising From" the Fraud</u>.

1. <u>Actual damages of $194,644</u>. Under either the fraud in the inducement theory or the actual fraud theory, Plaintiff is entitled to a nondischargeability judgment of $194,644, the amount she lost as a result of Defendant's fraud.

Plaintiff arguably suffered the following additional damages:

- 50% of $152,396 when Defendant spent Zamani Enterprise's money on the limousine and its entity, Elite Limousine, which was wholly owned by Defendant;
- 50% of $27,203 for the boat Defendant purchased for personal use by himself and Steve Martin; and

- 50% of $114,644, the difference between $80,000 (Defendant's contribution to Zamani Entertainment, borrowed from his parents) and the amount Plaintiff invested in Zamani Entertainment.

These amounts total $147,122.

If Plaintiff is made whole by recovering the money she invested and lost, however, awarding additional damages for the limousine, boat, and other frauds would overcompensate her.[12] On the other hand, if her actual damages are limited to $147,122, then she would not be fully compensated for the money she lost through Defendant's fraud. The Court finds that Plaintiff's actual damages arising from fraud are $194,644.

2.  Damages "arising from" the fraud. Once the bankruptcy court determines that a debtor owes a creditor money obtained by fraud, the court must declare nondischargeable all debts "arising from" the money fraudulently obtained. *Cohen v. de la Cruz*, 523 U.S. 213, 223 (1998) ("'any debt ... for money, property, services, or ... credit, to the extent obtained by' fraud encompasses any liability arising from money, property, etc., that is fraudulently obtained, including treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor."); *see also Woods*, 660 B.R. at 923 (citing and following *Cohen*). The Court has concluded that Defendant defrauded Plaintiff out of, at a minimum, $194,644. Those damages are nondischargeable under § 523(a)(2)(A).

The state court judgment makes clear it is based on Defendant's fraud:

Defendants are liable for violations of the prohibitions on financial elder abuse as provided by ORS 124.100 by way of Defendants and each of them having engaged in a scheme designed to deprive the Plaintiffs of money through artifice, false pretense, and fraud which were established clearly and convincingly.

---

[12] In addition, it is not clear the Plaintiff had standing to recover for the first two of these damages claims, as they may be owned by Zamani Entertainment. *See, e.g., Marchman v. NCNB Texas Nat. Bank*, 120 N.M. 74, 81 (S. Ct. 1995) (shareholder of a corporation does not have an individual right of action against a third party for damages that result from injury to the corporation).

The $194,644 Defendant procured by fraud clearly constitutes "economic damages" under Oregon's elder abuse statute, ORS 124.100 et seq. The state court judgment also includes $100,000 for "non-economic" damages. *See* ORS 124.100(2)(b) and ORS 31.705. Plaintiff gave testimony regarding her non-economic damages in the Oregon trial. The Court finds and concludes that those damages arose from Defendant's fraud. Likewise, the treble damages award arose from the fraud. *See* ORS 124.100(2)(a) and (b).[13] Finally, the award of post-judgment interest arose from Defendant's fraud. *See In re Deerman*, 482 B.R. 344, 376 (Bankr. D.N.M. 2012) (citing *In re Markarian*, 228 B.R. 34, 35 (1st Cir. BAP 1998)).

I.    The Court Does Not Rely on the Oregon Judgment to Find Causation Between the Fraudulent Conduct and the Judgment Debt.

As shown by the fact-finding and discussion in this opinion, the Court does not rely on the Oregon judgment to find causation between Defendant's fraudulent conduct and the judgment debt. Based on its own fact-finding, the Court concludes that Defendant defrauded Plaintiff, causing at least $194,644 in actual damages. Added to this are non-economic damages, treble damages, and post-judgment interest, as required by *Cohen*.

---

[13] Because the Court's actual damages finding is less than the Oregon court's, the nondischargeable amount is $883,933, i.e., ($194,644 + $100,000) x 3.

## Conclusion

Plaintiff is entitled to a declaratory judgment from this Court that $883,992 of the state court judgment, plus interest accruing on that amount at 9% per annum after May 14, 2010, is nondischargeable under § 523(a)(2)(A). A separate judgment will be entered.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: April 9, 2025
Copies to: counsel of record